FRANCES E. WILLIAMS, Respondent, *v.* THE UNITED STATES MUTUAL ACCIDENT ASSOCIATION of the City of New York, Appellant.

*Accident insurance — defense of voluntary exposure to danger — negligence as a matter of law — exposure to save life — amendment to an answer on the second trial of an action.*

Upon the trial of an action brought against an insurance company to recover on a policy of accident insurance, which contained the provision that the insurance "shall not extend to or cover   *   *   *   suicide, felonious or otherwise, sane or insane,   *   *   *   voluntary exposure to unnecessary danger,   *   *   *   or walking on the roadbed or bridge of any railway," it is for the defendant to establish the defense that the assured, at the time he was killed by being run down by a train on a steam railroad, went upon the tracks in front of the

approaching train with a suicidal intent, or that he voluntarily exposed himself to unnecessary danger, and that his death resulted therefrom. The plaintiff is not compelled to show as part of her affirmative case that the deceased did not commit suicide or did not voluntarily expose himself to unnecessary danger.

Voluntary is defined to mean "done by design or intention; purposely; intentional; not accidental," and to show a voluntary exposure on the part of the deceased the evidence must disclose a design or intention on his part to expose his life, or a high degree of negligence; something more than ordinary negligence is necessary.

Where a person had time, or had reason to believe he had time, to cross a railroad track in front of an approaching train, and in crossing fell and was run over by such train, negligence will not be imputed to him as a matter of law.

The law hesitates to impute negligence to a person who has exposed himself to danger for the purpose of saving life.

It is within the discretion of a trial court to allow an amendment to an answer on the second trial of an action.

HERRICK, J., dissenting.

APPEAL by the defendant, The United States Mutual Accident Association of the City of New York, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Saratoga on the 19th day of April, 1894, upon the verdict of a jury, rendered after a trial at the Saratoga Circuit, and also from an order made at the Saratoga Circuit on the 19th day of April, 1894, and entered in said clerk's office, denying the defendant's motion for a new trial made upon the minutes, with notice of an intention to bring up for review upon such appeal said judgment and order and the exceptions taken upon the trial of the action.

*Winsor B. French* and *Richard L. Hand*, for the appellant.

*Theodore F. Hamilton* and *Edgar T. Brackett*, for the respondent.

PUTNAM, J.:

This action was brought on a contract of accident insurance by which defendant insured the life of Alonzo C. Williams for the sum of $5,000 against death through external, violent and accidental means.

On the evening of November 22, 1889, said Alonzo was struck by a locomotive on the crossing of the Adirondack railway track, at Church street, Saratoga Springs, N. Y., and killed. Due proofs of death having been furnished defendant, it became liable to the

plaintiff under the insurance contract, unless the defenses set up in the answer were established by the evidence on the trial.

The contract, among other things, provided that the insurance "shall not extend to or cover   *   *   *   suicide, felonious or otherwise, sane or insane,   *   *   *   voluntary exposure to unnecessary danger   *   *   *   or walking on the roadbed or bridge of any railway."

Defendant claims that Williams, at the time he was injured, in going on the railroad track in front of an approaching engine in plain view, and which he saw, acted with a suicidal intent, or, at least, voluntarily exposed himself to unnecessary danger ; that his death resulted from gross negligence, and hence plaintiff was not entitled to recover.

On the first trial plaintiff obtained a judgment, which was reversed by the Court of Appeals (133 N. Y. 366). It is important, therefore, to determine to what extent, if at all, the facts established on the last trial differ from those appearing on the first.

At the place where Williams was killed the street runs east and west, and the railroad track north and south. Immediately before the accident deceased was coming easterly from some point west of the railroad track. From the opinion of Judge GRAY (133 N. Y. 369) it appears that on the first trial the following facts appeared : Williams met two Germans 100 feet east of the railroad track, walking in an opposite direction, and said to them : "Boys, look out for the engine ; maybe he will catch you." One of them replied, "I'm not afraid, my life is insured." The deceased must have turned and retraced his steps, as the engineer on the locomotive, immediately afterwards, saw him standing ten or fifteen feet from the track ; 'the train was then going at the rate of four miles an hour ; when the locomotive was about twenty-five feet from the crossing deceased walked· on to the track in front of the approaching cars, and, in the language of the witness, "squatted down" and received the injuries which caused his death ; there was no evidence showing that the two Germans were intoxicated ; they had gotten off the track when the engine came by, and deceased was not called upon to incur danger in their behalf.

· In his opinion Judge GRAY remarks : "When seen just before the train struck him, he was, at first, standing away from the track

crossing, with the train about twenty-five feet off, and then deliberately going upon the track, stopping and lowering his body in front of the engine. The men whom he had met and addressed had crossed and were away from the track. There was no evidence of their coming back upon it, nor of any circumstance requiring the assured to change the position of safety in which he was, as the train was approaching the crossing." It being urged by counsel for plaintiff that, as the evidence in the case was such as to negative the idea of any motive on the part of Williams to destroy his life, and as, from the facts appearing, another motive might be inferred to account for his actions at the time, the case was not one where the court could presume a suicidal intent, or impute negligence on the part of deceased, Judge GRAY further says: " The argument would be unanswerable in a case where the facts were disputed and any at all existed from which an inference was possible that there was a reasonable or excusable cause for the occurrence. In the present case there is no dispute as to how the accident occurred, nor as to the conduct of the deceased which permitted it."

On the last trial a different state of facts was established — a state of facts which plaintiff claims justly entitled her to the judgment she obtained, under the opinion of Judge GRAY above referred to.

The witness Powers testified that he was eighty or ninety feet from the crossing at the time of the accident and saw deceased when he met the Germans. Instead of such meeting being at a point 100 feet east of the track, it was at or a few feet from it. The men were intoxicated, noisy and staggering from side to side of the street. As deceased met them at the track they all stopped a moment while Williams made some remark which the witness did not understand. Williams turned around, apparently motioned to the men to leave the track, and then seemingly endeavored to escape himself, but slipped, and falling was struck by the engine. In the language of the witness, " He saw the locomotive and started to get out of the way and fell. He slipped ; he started to take a step, slipped down and fell." The witness' account of the meeting of Williams and the two men, on his cross-examination, which I quote from appellant's points, was as follows: " Mr. Williams, when they were within a foot of the railroad, was just across on the west side.

He came across the railroad and met them as they were on the east side of the railroad track; he met them when they were *about a foot from the railroad track or on the track.* The cars were then probably 30 or 40 feet below.  *  *  *   Electric lights were burning and the headlight shining and the bell ringing, but the Dutchmen and Mr. Williams stopped and talked with each other, and the cars kept coming.  Williams didn't go any further.  The Dutchmen went on the track.  They went on, but they didn't go across. Williams looked back and motioned them to get off.  After the Dutchmen stepped off the track he turned to go off the track, turned southward and he saw the cars, and he whirled and started to run and get out of the way northwestward.  He was on the track and turned to get out of the way, turned kind of southward, and it looked to me that he saw that the cars were so close to him that he could not get out of the way and turned northwest to go across.  He was about half way across when he turned to go southward."

As the evidence disclosed the fact that Williams was killed in consequence of being struck by a locomotive engine, under the contract of insurance plaintiff was entitled to recover unless defendant made it appear, or the evidence showed, that it was a case of suicide or voluntary exposure to unnecessary danger.  It was for the defendant to establish this defense.   Plaintiff was not compelled to show, as part of her affirmative case, that Williams *did not* commit suicide or *did not* voluntarily expose himself to unnecessary danger. (*Van Valkenburgh* v. *Amer. Popular Life Ins. Co.,* 70 N. Y. 605; *Jones* v. *The Brooklyn Life Ins. Co.,* 61 id. 79.)

I am of the opinion that the testimony of Powers and the other evidence in the case presented a question of fact on the issues raised by the pleadings for the jury to pass upon.   The jury could have properly found from Powers' testimony that deceased, meeting two drunken men on the railroad track, and in their condition exposed to the danger of being killed by the approaching locomotive, in the attempt to hasten them over the track, unconsciously stepped or remained on it, slipped down and was himself killed.   It may be gathered from the evidence that had he not fallen he would not have been run over.   He was trying to escape, as Powers testified, and the witness Myers said if he had continued to walk and had not sunk down on the track he could probably have escaped.   The jury could well

have found that the death of Williams was the result of a mere accident, being occasioned by his slipping down in front of the approaching engine.    Powers, in one part of his testimony, said deceased met the Germans from one to three feet east of the track; if so, while speaking to the two men and endeavoring to hasten them on their way, he might naturally and unconsciously take a step or two towards them.    But the witness is not clear as to the exact location where they met.    He said "he met them when they were about a foot from the railroad track, *or on the track.*"    In any view of the case I cannot believe that it should be held as matter of law that deceased moved in front of the cars with a suicidal intent or in consequence of a voluntary exposure to unnecessary danger.    Voluntary is defined to mean "done by design or intention; purposely; intentional; not accidental."    To show a voluntary exposure on the part of deceased, the evidence must have disclosed a design or intention on his part to expose his life, or a high degree of negligence; something more than mere ordinary negligence.    As we have seen, the evidence of Powers allowed the jury to find that seeing two drunken men exposed to danger of being killed by the approaching engine, in the humane desire to save them he unconsciously remained or stepped on the track, slipped, fell and was run over.

It has been held in an action for damages against a railroad corporation, that where one had time, or had reason to believe he had, to cross a railroad track in front of an approaching train, and in crossing fell and was injured, negligence would not be imputed to him as matter of law.    (See *Baxter* v. *Second Ave. R. R. Co.*, 30 How. 219; *Belton* v. *Baxter et al.*, 58 N. Y. 411; *Bernhard* v. *Rens. & Saratoga R. R. Co.*, 1 Abb. Ct. App. Dec. 131.)

So, Williams, as the jury could have found, had he not fallen, would have had time to leave the track before the engine struck him, and hence, could not, as matter of law, be deemed to have been even negligent.    Certainly, under the circumstances, the jury could properly determine that he should not be held to have been guilty of that degree of negligence which was equivalent to a voluntary exposure of his life to danger.

The law hesitates to impute negligence to one who has exposed himself to danger for the purpose of saving life.    (*Tucker* v. *Mut. Ben.*

*Life Co.*, 50 Hun, 50; 121 N. Y. 718; *Eckert* v. *R. R. Co.*, 43 id. 502.) Deceased, if the witness Powers is to be credited, at the time of the accident, was engaged in a humane effort to save two drunken men from injury or death. There is no reason to doubt that the men were in peril, or that Williams thought so. When the latter met them, the locomotive, going four miles an hour, or five feet per second (according to appellant's computation), was thirty feet distant (as Powers testified), and required only six seconds to reach them. Men under the influence of liquor, staggering from side to side of the street, and on or quite near the track, with an engine only six seconds distant, could properly be deemed in a dangerous position. It should also be remembered that from the time Williams met the Germans until he was struck ·was also only six seconds. He was compelled to act hastily and without time for reflection. These facts have an important bearing on the questions involved in the case. I think under the testimony the jury were justified in determining that the death of Williams was caused by accidental means; that. there was no evidence sufficient to establish the fact that he died in. consequence of a voluntary exposure to unnecessary danger. The evidence rather shows that his death was the result of the accident of his slipping down on the track when he was endeavoring to escape from the engine; that he had inadvertently stepped or remained on the track while endeavoring to save the two men from injury.

The jury was authorized to credit the evidence given by the witness Powers. He was not impeached. Nothing in his testimony rendered his statement incredible; nor was the preponderance of contradictory evidence so great as to authorize the trial judge to withdraw his testimony from the consideration of the jury. His statement of the transaction was the more probable one, and the jury was justified in believing it. *First.* As to the two Germans being intoxicated. They admitted having come from a liquor saloon where they each drank three glasses of beer and had passed a portion of the afternoon before meeting Williams. The remark of Williams — " Boys, look out for the engine; maybe he will catch you " — to them, is not one that he would probably have made to two sober men, strangers to him, but a natural remark to men under the influence of liquor and exposed to danger from an approaching engine.

Again, it was shown by two witnesses that when struck Williams gave a long, loud and shrill scream. Volger, who was much nearer than these witnesses, did not hear the scream, and the other German testified to hearing a noise, but does not mention the cry of Williams when struck by the locomotive. If these men were sober, and within twenty or twenty-five feet of deceased when he was struck, it was strange that one or both should not have noticed a sound that attracted the attention of Galusha and Van Doren, who were much further away. On the whole, it is extremely probable that Powers told the truth when he testified that the two men were intoxicated.

Again, the whole account of the transaction given by Powers, in connection with other evidence in the case, was the more probable and reasonable one. From such account, and the other testimony, the following state of facts appeared : Williams was a man over sixty years of age, religious, of exemplary habits, of good character and cheerful disposition, and not in seriously embarrassed circumstances. He had left his home a short time before to make a business call west of the railroad track, and was returning when the accident occurred. In coming east he crossed the track, a locomotive was approaching, and he met two intoxicated Germans, staggering and noisy, and he made the remark to them above quoted. The cars were almost upon them. He turned and motioned to them to cross and in so doing, doubtless, stepped on to the track. Turning to escape he slipped, and falling, was run over.

On the other hand, the theory of defendant, founded on the testimony of the two Germans and Myers, is that Williams, a man, as above described — religious, cheerful, of good character and exemplary habits — coming across the railroad track and meeting the two men, who were sober and presumably acting like sober men, 100 feet east of the track, said : " Boys, look out for the engine ; maybe he will catch you." After he passed the two sober men he turned, followed them back to the railroad track, and then, in the language of Myers, " squatted down " on the track in front of the approaching locomotive. It seems to me that the jury was fully justified in believing the probable story of the transaction as related by Powers and in not believing the improbable and almost incredible statement of the two Germans.

I have not overlooked the testimony of the witness Myers, that the first he saw of Williams the latter was ten or fifteen feet from the track, and from that point walked directly in front of the locomotive.   It was for the jury to determine which of the two witnesses, Powers or Myers, gave a correct statement of the transaction. If, however, Williams *did*, in his desire to hasten the two intoxicated men from a position which he thought dangerous, went back a few steps on to the track, that fact would not compel a reversal of the judgment.   It did not show a voluntary exposure to unnecessary danger.   As above suggested, the evidence indicates that when he went, or was on the track, he probably would have had time to move out of the way of the engine had he not slipped and fallen, and that his death was caused by the accident of his fall.

It will not be doubted that in fact deceased accidentally fell, as Powers testified, instead of "squatting down" on the track, according to Myers' statement.

The learned counsel for the appellant is not correct in his statement that four witnesses swore positively that Powers was not present at the time of the accident.   The witnesses referred to simply testified that they did not see him there.   It was shown that there was "quite a crowd" of people who gathered immediately after the accident, and the attention of the witnesses was not called to who were present.

It was clearly within the discretion of the court below whether or not to allow an amendment to the answer on the second trial of the case.   Other questions were raised which I do not think necessary to discuss.

I conclude that the learned trial judge was justified in submitting the questions of fact involved in the case to the jury, and that the verdict was sustained by the evidence.

The judgment should be affirmed, with costs.

MAYHAM, P. J., concurred.

HERRICK, J. (dissenting) :

This case has already been before this court upon appeal, and will be found in 133 N. Y. 366.

The facts are so fully set forth there that a recital of them now I think is unnecessary, as, with the exception hereinafter stated, they

appear to be substantially the same as they appeared upon the former trial and hearing. .

Upon the second trial a witness named Powers was sworn who was not called upon the former trial; his testimony, if true, relieves the deceased from any charge of suicide.

Upon the former trial the engineer testified that he saw Williams start to go upon the track; he says that if the man had kept on walking he could, in all probability, have crossed in safety, but that he "squatted down," as in the position of kneeling. Powers' testimony is to the effect that, instead of deliberately squatting down or kneeling, Williams slipped down and fell.

It seems to me that constitutes the only substantial difference in the facts as they appeared upon the first trial and as they appear now.

Assuming Powers' version to be the correct one, the question arises as to whether there was a sufficient conflict of evidence in the case to warrant its submission to a jury.

The theory of the plaintiff appears to be that Williams lost his life in an endeavor to warn or save two intoxicated persons from danger. The only one of the two persons declared by Powers to have been intoxicated, who was sworn upon the trial, swears that neither he nor his associate was intoxicated, and Powers only saw them at a distance of ninety feet or more on a misty evening. While none of the witnesses sworn knew anything about Powers' presence, and while his testimony as to what took place is in conflict with that of all the other witnesses sworn upon the trial, yet it must be assumed that the jury found his version of the transaction to be the true one.

For the purposes of disposing of this case as it now appears, it will be assumed that the deceased, instead of deliberately or voluntarily losing his life, lost it in an endeavor to save others from death or danger; although, as a matter of fact, the witness Powers says that the two persons Williams stopped to warn were not in danger, and the testimony of one of the persons who was so warned negatives any idea that they were in danger, and indicates that they were fully as able to take care of themselves as was the deceased, and were equally aware of the perils of the place.

I do not think that exposure of oneself to danger for the purpose

of saving the life of another is such a " voluntary exposure to unnecessary danger," etc., as to release the defendant from liability upon its policy.   The law has so high a regard for human life that it will not impute negligence to any effort to preserve it, unless made under circumstances constituting rashness in the judgment of prudent persons.   (*Eckert* v. *L. I. R. R. Co.*, 43 N. Y. 502.)

Efforts to save the lives of others are to be commended and encouraged, and not prohibited either by statute or contract, and dangers necessarily incurred in such efforts may be properly and rightly incurred, even under the terms of a policy like that issued by the defendant in this case; but the assured is not justified in doing unnecessary things or taking unnecessary risks to save the life or limbs of others.

And while the court will not attempt in cold blood to scrutinize too carefully acts done upon the spur of the moment in an endeavor to protect others, or measure acts of heroism by rule of thumb, still, when it appears that the assured has been injured, or lost his life by doing unnecessary or reckless things, it cannot justify him under the plea that they were done to save human life.

What was done by the deceased in this case does not appear to have been done in a hurry, or under any excitement, or under conditions where it might be inferred that he had become confused, and that, therefore, allowance should be made for his acts, as would be done in the case of one who suddenly finds himself in danger, where the court will not scrutinize too carefully the measures that he takes to extricate himself therefrom, and will not hold him responsible, because, under such conditions he did not choose the best; here he saw the coming danger and attempted to warn others of it; he did not hurry to do it, but did it quietly and deliberately.

The train did not come upon him suddenly and without his knowledge; it came with the ringing of bells, with the glare of the headlight upon the engine, and was seen by him approaching; there was no occasion for him to get in the way, and there was ample time for him to get out of the way.

The account of the witness Powers is not entirely clear, but any view that we may take of his testimony shows that the deceased was guilty of negligence, not to be justified by the plea of an endeavor to save others from danger.   Assuming that they were in danger,

what was done by the deceased which resulted in the sacrifice of his life was wholly unnecessary.

The witness Volger, the only one of the persons warned by him who was sworn upon the trial, says that when he first saw the deceased he was about 200 feet away. " We looked away ahead and saw him; then he was on the other side of the railroad; then he crossed the track and was coming towards us and we met him by Smith's gate." He says, " Boys, look out for the cars; maybe the engine will catch you." He says, "Look out, boys, the engine will catch you." August said, " I am not afraid; my life is insured." " He stopped when he said that, and we did too ; * * * nothing else was said there; he started east and we west."

The witness, at another point, testifies that they went on across the railroad tracks; the cars were going slower and slower; the bell ringing and then they stopped; that they thought that something must be the matter; that they went to the place where the train had stopped and found the deceased injured upon the rails.

Powers' version of what took place is, that he was going up the street which the railroad crosses when he saw two other men going up the street; that they were going westward; " they got up near the Church street crossing and stopped; there was another man coming down, coming east, and they stepped on the railroad; as he stepped off, they stopped again, and he turned and said something to them, I don't know what it was; then they stepped off and he followed them; he didn't follow them, but just turned around, and as he turned around he stood there probably half a minute and all at once he looked down and motioned as though he was going to turn around and he saw the locomotive and started to get out of the way and fell; he slipped; he started to take a step, slipped down and fell."

Again, he says : " The gentleman met these two men on the east side of the railroad track; I could not say how far from the east rail ; it might have been three or four feet; it might not have been so far; that is as near as I can fix it; I should say I was distant from there in the neighborhood of eighty or ninety feet." And, again, " Mr. Williams, when they were within a foot of the railroad, was just across on the west side * * * of the track coming east; he came across the railroad and met them as they were on the east

side of the railroad track; he met them when they were about a foot from the railroad track, or on the track."

He further stated that at the time the deceased met the Dutchmen the cars were probably thirty or forty feet south on the track going north; that the Dutchmen and the deceased stopped and talked with each other while the cars were coming up, or, as he explained it, they just turned around and spoke. He states that when Williams met these two men they were on the east side of the railroad track, within a foot or two of the rail, the cars being forty feet from them; that the Dutchmen were going westward; that "after the Dutchmen stepped off the track he turned to go off the track, turned southward, and he saw the cars and he whirled and started to run and get out of the way."

Taking this testimony, it would appear that the deceased, for the purpose of warning the two Dutchmen, so called, when he saw them near the railroad track, but not on it, himself stepped right on the track between the rails, when a train of cars was approaching, distant only thirty or forty feet from him, to warn them of their danger. It is true that the train was going at a slow rate of speed, estimated from four to six miles an hour, but if it was dangerous to them it was dangerous to him.

For the purpose of warning them of their danger there was no occasion for him to step in front of an approaching engine and talk with them; it was not necessary for him to stop; it was not necessary for him even to cross the track for the purpose of warning, and if he had crossed the track, there was no occasion for his pausing to talk with men who were not upon it.

It does not present the case of a person prostrate upon the railroad track and the rescuer going thereon for the purpose of lifting or dragging him off. Here is a mere verbal warning being given, which could just as well have been given across the track as upon it, or in passing by across the railroad track without stopping.

While, as stated before, it is not well to hold too closely as to what is, or what is not, necessary to be done in an effort to save the life of another, still, what is alleged to have been done in this case was so wholly unnecessary and so grossly negligent that, even under a liberal construction as to the allowance to be made for efforts made by an assured in endeavoring to save another from death or injury, I

cannot hold that in this case he did not necessarily and negligently expose himself to unnecessary danger within the meaning of the defendant's policy issued to him.

For these reasons I think the judgment should be reversed and a new trial granted, costs to abide the event.

MAYHAM, P. J. :

I am inclined to hold that whether or not the assured " unnecessarily and negligently exposed himself to unnecessary danger within the meaning of the policy " was, under the circumstances of this case, a question of fact for the jury, with whose findings the appellate court should not interfere. The deceased had time to cross the track before the train reached him, and there was evidence that he slipped and fell ; this the jury might have found.

Judgment affirmed, with costs.